United States District Court
Middle District of Florida
Orlando Division

MICHAEL DOYLE HARBIN,

>   *Plaintiff,*

v.                                    NO. 6:15-CV-2132-ORL-28PDB

COMMISSIONER OF SOCIAL SECURITY,

>   *Defendant.*

---

## Report & Recommendation

Michael Doyle Harbin appeals the Social Security Administration's ("SSA's") denial of his claim for disability-insurance benefits. Doc. 1. He seeks reversal and remand, Doc. 16; the Commissioner, affirmance, Doc. 17. I recommend reversal and remand.

### I.    Issues

Harbin raises two issues: (1) whether the Administrative Law Judge ("ALJ") provided good cause to discredit the opinions of treating source Jared Ritter, M.D.; and (2) whether substantial evidence supports the reasons the ALJ provided for discrediting Harbin's allegations of pain and limitations.[1]

### II.   Background

Harbin was born in 1961 and last worked in 2011. Tr. 256, 305. He completed high school, he completed two years of college, and he has experience as a customer-service representative, a respiratory-center manager, a respiratory therapist, and a

---

[1]To incorporate the correct standards of review, the wording of the issues differs from Harbin's wording of the issues. *See* Doc. 16 at 1.

stockbroker. Tr. 72–76, 290, 306. He alleges he became disabled in 2011 from neck and back injuries caused by a car accident. Tr. 76, 256, 305. He is insured through 2016. Tr. 265, 288, 301. He proceeded through the administrative process, failing at each level.[2] Tr. 1–6, 9–35, 122–24, 127–31. This case followed. Doc. 1.

## III.  Evidence

### A.  *Self-Reported Evidence*

Harbin submitted two pain questionnaires and a function report. Tr. 320–22, 331–33, 334–41. On the first pain questionnaire, completed in July 2013, he asserted the following.

He has neck and back pain that is worst in the morning, after activity, and when he holds his head up too long. Tr. 320–21. Driving, sitting, standing, and walking increase pain. Tr. 320–22. Rest and medication help relieve pain, and ice helps decrease neck and lumbar-region inflammation. Tr. 321. He cannot take his children out to have fun because, if he does not lie down, neck and back pain increase. Tr. 322.

Meal preparation involving many steps causes neck and back pain, so he prepares microwave meals or orders takeout. Tr. 321. He can care for his hair but has trouble bending to reach parts of his body while bathing. Tr. 321. He has trouble lifting his legs to get dressed and cannot put on socks and shoes. Tr. 321. He cannot

---

[2]The SSA uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of their denial. *Bowen v. New York*, 476 U.S. 467, 471–72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900–404.906. If the claimant is dissatisfied with the initial determination, he may ask for reconsideration. 20 C.F.R. §§ 404.907–404.918. If he is dissatisfied with the reconsideration determination, he may ask for a hearing before an ALJ. 20 C.F.R. §§ 404.929–404.943. If he is dissatisfied with the ALJ's decision, he may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967–404.982. If the Appeals Council denies review, he may file an action in federal district court. 20 C.F.R. § 404.981. Section 405(g) provides the basis for the court's jurisdiction.

clean glass, mop, or clean the bathrooms in the condominium he rents. Tr. 321–22. His children (teenagers) help him do laundry by carrying the laundry basket and folding clothes. Tr. 321. He tries not to shop for more than an hour. Tr. 321. He has trouble sleeping because of neck and back pain. Tr. 321.

On the second pain questionnaire, completed in September 2013, Harbin asserted the following.

In addition to the assertions in the first questionnaire, he needs to lie in bed after being up a few hours. Tr. 331. He cannot reach above his head because it causes neck pain and cannot bend because it causes pain to radiate through his legs. Tr. 331. He can sit for 30 to 60 minutes before he needs to stand because his back gets stiff. Tr. 333. After taking a pain pill, he can stand for 30 to 60 minutes and walk for 10 to 15 minutes before the pain increases. Tr. 333. The pain is constant and chronic. Tr. 332. Pain medicine, anti-inflammatory medicine, ice packs, and heating pads help relieve the pain. Tr. 332. He has tried using a TENS unit for neck and back pain, but it has provided no significant relief. Tr. 332. He uses a walker around the house and is trying to get a cane because he has fallen when his legs weaken. Tr. 333.

He has a hard time shaving because it involves moving his neck, uses a rest and chair in the shower, cannot reach to clean himself after using the bathroom, and wears only slip-on shoes because he cannot put on socks. Tr. 332. His children clean and do the laundry. Tr. 332. When shopping, they put things in the basket, push the cart, load and unload the car, and put the groceries away. Tr. 332. Driving is the most difficult thing he does, and he limits it to driving to doctor's appointments and shopping twice a month. Tr. 333. He wears a neck collar and cannot turn his neck to back out. Tr. 333. He does not want to be around people because of anxiety and constant pain. Tr. 333.

Even with sleep medication, he can sleep for only three to four hours. Tr. 332. He has to decide whether to take pain medication and leave himself "short" the next day or to stay up until he can take his regular dose. Tr. 332.

On the function report, completed in September 2013, Harbin repeated the assertions from the pain questionnaires and added the following.

Before his injury, he played golf and basketball, surfed, lifted weights, ran, played with his children, cooked, read, conducted computer research, and spent time with friends. Tr. 335, 338. Now, he cannot focus or concentrate, cannot stand for more than 20 to 30 minutes, and does not want to be around anyone but his children. Tr. 335, 336, 338. He has trouble getting along with family because they do not understand his pain. Tr. 339. His only hobby is watching sports on television. Tr. 338.

On a normal day, he wakes up, drinks coffee, eats cereal, watches television, lies down when pain gets too bad, eats lunch, watches more television, gets his children from the bus stop, lies down again, prepares dinner, checks his children's homework, watches more television, and then goes to bed. Tr. 335. He cares for his children three weekends a month and every other week in the summer. Tr. 335. He only prepares meals when his children are there; otherwise, he eats frozen meals, cereal, or sandwiches. Tr. 336. He takes about 20 minutes to make breakfast and 20 to 30 minutes to make dinner. Tr. 336. He makes the bed about three times a week. Tr. 336. He goes to church with his children about once a month. Tr. 338. His condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and concentrate. Tr. 339. He can walk one to two blocks before he needs to rest for 10 to 20 minutes. Tr. 339.

His pain is so intense he cannot focus or concentrate "for any length of time." Tr. 334. He can pay attention for about 15 to 30 minutes, but it varies from day to day. Tr. 339. He can follow written instructions if they are simple and involve only a few steps but has more difficulty with instructions involving multiple steps. Tr. 339.

He can follow simple oral instructions. Tr. 339. He uses a pill organizer to remember to take medication. Tr. 336. He likes to "keep things very simple" and follows a set routine. Tr. 340. He does not handle stress well and has a hard time being around people because of anxiety, for which he has sought professional help. Tr. 340.

He provided the following summary of his abilities:

Lifting – I cannot lift anything more than 5 lbs. Can lift a gallon of milk

Squatting – Unable to squat down too much pain in my lumbar region

Bending – Unable to bend down pain in my lumbar region

Standing – Able to stand for 10-20 minutes after that pain in my neck + lumbar region

Reaching – Unable to reach higher than my head

Walking – Able to walk short distance then need rest periods. Use cane when I go out shopping.

Sitting – After 20-30 minutes but back became stiff and then I need to get up

Kneeling – Unable to kneel because I cannot get up to[o] painful for lumbar regions

Stair climbing – I live in a building with stairs but I always use the elevator. Climbing stairs to[o] painful.

Completing tasks – simple tasks I can complete but have difficulty in complex or multitasking

Concentration – Unable to focus long enough because I cannot get the pain out of my mind.

Tr. 341.

At a 2013 doctor's appointment, he indicated on a self-report form that he reads books, watches business news, watches sports, picks up his children at the bus stop, and fishes with his children. Tr. 689.

### B.     Hearing Testimony

At a hearing before the ALJ in June 2015, Harbin testified as follows.[3]

He completed two years of college and has worked as a stock broker, customer-service representative, respiratory-center manager, and respiratory therapist. Tr. 72–76, 90. As a therapist, he provided home care, carried 20- to 40-pound oxygen tanks, and performed computer tasks while seated. Tr. 73–74.

In 2011, he was in a car accident.[4] Tr. 76. Afterward, his neck, back, and shoulder hurt, and he began seeing Albert Gillespie, M.D., an orthopedist. Tr. 76–77. Dr. Gillespie took x-rays of his neck and back and recommended physical therapy, which did not help. Tr. 77, 80. Dr. Gillespie did not recommend surgery or prescribe pain medicine. Tr. 77–78, 80. He saw Dr. Gillespie from November 2011 to March 2012. Tr. 77. After Dr. Gillespie assessed maximum medical improvement, he began seeing Michael Broom, M.D. Tr. 78. Dr. Broom administered epidurals, which provided minimal relief, and prescribed pain medication, which did not really help. Tr. 80–81. He saw Dr. Broom every month. Tr. 80. Dr. Broom referred him to a pain management doctor in November 2013 because the other medication was not allowing him to "tolerate [his] day." Tr. 82.

---

[3]The hearing was originally convened in January 2015, but the ALJ continued it after it became clear the medical expert had not reviewed all the evidence. Tr. 45–47. Harbin did not testify at that hearing. *See generally* Tr. 37–47. The medical expert testified at the June 2015 hearing, Tr. 52–71. The ALJ gave that testimony "limited" weight because he did not identify Harbin's "obvious" lumbar surgery, which "casts some considerable doubt on just how well or extensively he actually reviewed the claim file." Tr. 26–27. Because Harbin does not challenge the ALJ's treatment of the medical expert's testimony or contend it bears on his arguments, *see generally* Doc. 16, that testimony is omitted from this summary.

[4]Harbin settled a worker's compensation claim related to the car accident in April 2012 and was litigating a personal injury claim at the time of the hearing. Tr. 78–79.

He takes morphine and hydrocodone. Tr. 81. They help "a little bit"—with the medication, his pain is a seven; without it, it would be a ten. Tr. 83. He uses a prescribed cane to walk to prevent falling. Tr. 86. He pays for pain management through Medicaid. Tr. 83. He needs shoulder surgery, but has not had it because he has no insurance.[5] Tr. 83.

He tried to return to work in April 2014 without success. Tr. 81. He could not work as a press operator because he could not "sit or stand during the shift." Tr. 81. He could not work for Hawaiian Tropics because he could not stand for more than 30 minutes. Tr. 81. He could not deliver subs for Jimmy Johns because it was "too much" for his neck and back. Tr. 81. His neck and back issues are the main reasons he is not working. Tr. 86.

During the day, he drinks coffee, watches television, and reads. Tr. 84. During the school year, he "get[s] the kids off to school." Tr. 84. He tries to keep housework to a minimum but can sweep, do dishes, and cook food in the microwave. Tr. 84. He can sit or stand for 30 minutes before needing to lie down. Tr. 84, 87. He needs to lie down for about an hour four or five times a day. Tr. 87. He can walk about 50 feet with a cane, cannot bend at the waist, and can lift only five pounds. Tr. 87. He shops once a week or every two weeks and drives up to 20 miles to doctor's appointments. Tr. 85–86. His children take the bus to school. Tr. 85.

The ALJ asked a vocational expert ("VE") to consider a hypothetical individual the same age as Harbin who has his same education, past relevant work, and the following limitations:

> Assume I find such an individual through an eight hour day with regionally customary breaks, could sit for a total of six hours, stand and walk for two hours, lift ten pounds occasionally and five pounds or less more frequently. In terms of using their arms and hands, and lower

---

[5]Harbin did not explain using Medicaid to pay for pain management but having no insurance to obtain shoulder surgery. *See generally* Tr. 83–84.

extremities to operate arm, hand, and foot pedal controls, those could be done occasionally. He can climb ramps and stairs occasionally, but never climb ropes, ladders, and scaffolding. All other postural activities are available occasionally. With regard to his ability to manipulate objects within the defined weight limits, he can reach all, in all directions except overhead without limitation. Overhead reaching should be avoided. With regard to his ability to handle, finger, and feel, no limitation of function. No limitations in his ability to see, speak, and hear. Keep him away from unprotected heights, work around dangerous moving machinery, or in proximity to concentrated industrial vibration. There would be no mental impairments that would otherwise reduce the occupational work base. I am aware of some treatment, but the Claimant did not indicate such and did not indicate limitations that precluded work for such issues. Based, and also the use of a hand[-]held assistive device can be used during the time he would be standing and walking. And the standing and walking alternating with sitting should be every 30 minutes. So he can sit for 30 minutes, stand and walk for 30 minutes before resuming a seated position. But when he's standing and walking, he needs the use of a hand[-]held assistive device, so that he only has one hand for lifting and carrying.

Tr. 92–93.

The VE testified as follows.

The hypothetical individual could perform past work as a stockbroker and customer-service representative. Tr. 93. Those jobs are often performed using a headset that allows more flexibility to change positions. Tr. 93. Neither job would allow lying down four times a day. Tr. 94. An employer would tolerate up to one absence a month. Tr. 94. Jobs in Florida typically allow two 15-minute breaks and a lunch break lasting 30 minutes to an hour. Tr. 94.

## IV.   ALJ's Decision

At step one,[6] the ALJ found Harbin has not engaged in substantial gainful activity since his alleged onset date. Tr. 14.

---

[6]The SSA uses a five-step sequential process to decide if a person is disabled, asking whether (1) he is engaged in substantial gainful activity, (2) he has a severe impairment or combination of impairments, (3) the impairment meets or equals the

At step two, the ALJ found Harbin suffers from severe impairments of a history of lumbar spine degenerative disc disease with lumbar spine fusion from L3 to S1, a history of an anterior cervical spine discectomy and decompression from C5 to C7 with residual pain, and a history of some degenerative changes of his shoulders due to partial rotator cuff tears and impingement. Tr. 14. He found Harbin's medically determinable impairments of an anxiety disorder not otherwise specified and possible bipolar disorder, considered singly and in combination, do not cause more than minimal limitations in his ability to perform basic mental work activities and therefore are not severe. Tr. 14–15.

The ALJ considered the "paragraph B" criteria[7] to determine the severity of Harbin's mental impairments and if they meet or equal the criteria of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1.[8] Tr. 15. He found Harbin has a mild limitation in activities of daily living; a mild limitation in social

---

severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) he can perform any of his past relevant work given his residual functional capacity (RFC), and (5) there are a significant number of jobs in the national economy he can perform given his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). If the SSA finds disability or no disability at a step, it will "not go on to the next step." 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

[7]To evaluate a mental impairment, an ALJ must evaluate four "paragraph B" criteria (activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation) and the extent of any limitation in the first three areas (none, mild, moderate, marked, or severe). 20 C.F.R. § 404.1520a(a) & (c). An ALJ's "written decision must incorporate the pertinent findings and conclusions based on the technique." 20 C.F.R. § 404.1520a(e)(4). "The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4).

[8]The regulatory listings describe impairments severe enough to prevent gainful activity. *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). To have a listed impairment, "a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Id.*

functioning; a mild limitation in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. Tr. 15. He explained those limitations are not a residual functional capacity ("RFC")[9] assessment but used to rate the severity of mental impairments at steps two and three. Tr. 15.

At step three, the ALJ found Harbin has no impairment or combination of impairments that meets or medically equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1. Tr. 16. He considered listings under section 1.00 (musculoskeletal system) and 12.00 (mental). Tr. 16.

After stating he had considered the entire record, the ALJ found Harbin has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a)[10] with additional limitations:

> [T]he claimant requires the option to alternate his position between sitting and standing and walking every 30 minutes. The claimant requires the use of a hand held assistive device for standing or walking. When the claimant walks with a cane, he will have only one hand available for lifting or carrying. The claimant is able to sit for 30 minutes at a time for a total of six hours in an eight-hour workday. The claimant can stand or walk for 30 minutes at a time for a total of at least two hours in an eight-hour workday. The claimant can occasionally use his arms, hands[,] and lower extremities to operate arm/hand and foot/pedal controls. The claimant has no limitations in his ability to undertake manipulative activities such as handling, feeling, fingering[,] and reaching in all directions except overhead, seeing, speaking[,] or

---

[9]A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The SSA uses the RFC at step four to decide if he can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy he can perform. 20 C.F.R. § 404.1545(a)(5).

[10]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

hearing. The claimant can occasionally climb ramps or stairs, but can never climb ladders, ropes[,] or scaffolds. The claimant can occasionally balance, stoop, crouch, crawl[,] and kneel. The claimant must avoid work around unprotected heights, dangerous machinery[,] and concentrated industrial vibrations.

Tr. 16.

The ALJ summarized the medical, opinion, and testimonial evidence, including records from Dr. Ritter. Tr. 17–28.

In August 2014, Dr. Ritter saw Harbin for psychiatric therapy. Tr. 573–78. Under "Review of Symptoms," Dr. Ritter documented generalized pain; lethargy; feeling overweight despite weight loss and no recent weight gain; difficulty falling asleep; early morning awakening; excessive sleepiness; sleep continuity disturbance; decreased concentration, appetite, energy level, interest, and libido; guilt and hopelessness; panic attack; anxiety; no remote or recent memory impairment; and no mania, phobias, psychotic symptoms, eating disorders, obsessions, compulsions, dissociations, or flashbacks. Tr. 573. A mental status examination showed poor grooming; obese and unkempt appearance; no chronic illness; warm and dry skin with no noticeable scars or marks; no abnormalities of the head and face; appropriate expression; anxious, restricted, and not labile mental status; no tearfulness or crying; no racing thoughts or pressured speech on clinical exam; poor motivation; an adequate fund of knowledge; full orientation; anxious and depressed but not agitated, flat, or labile mood and affect; intact judgment and insight; normal speech; racing thoughts;[11] no disconnected, disordered, or slow thoughts; no thought preservation; no deficiency or loosening of thought association; no tangentiality; no circumferentiality; good eye contact; appropriate cooperation; and normal motor activity and gait. Tr. 575–76. Harbin admitted suicidal ideation but, according to Dr. Ritter, exhibited no delusions, hallucinations, or paranoia and denied obsessions,

---

[11]The record contains no explanation for the inconsistent notes on racing thoughts.

preoccupation with violent thoughts, suicidal intent, suicidal plans, homicidal ideation, homicidal intention, or homicidal plans. Tr. 575–76. Under "Assessment," Dr. Ritter observed that Harbin was divorced, unemployed, applying for disability, had legal and financial problems, and had a history of being employed in a specialty profession and opined he had unstable anxiety, insomnia secondary to mood and anxiety problems, stable tobacco dependence, stable alcohol use, unstable bipolar I disorder, and unstable polypharmacy. Tr. 577–78.

Dr. Ritter provided therapy again in November 2014.[12] Under "Review of Symptoms," Dr. Ritter documented generalized pain; lethargy; feeling overweight; no recent weight loss; difficulty falling asleep; early morning awakening; excessive sleepiness; sleep continuity disturbance; decreased concentration, appetite, energy level, interest, and libido; guilt or hopelessness; anxiety; no recent or remote memory impairment; and no mania, panic attack, phobias, psychotic symptoms, eating disorders, obsessions, compulsions, dissociations, or flashbacks. Tr. 628. A mental status examination showed poor grooming; prescription glasses; obese and unkempt appearance; no chronic illness; warm and dry skin with no noticeable scars or marks; no abnormality of the head or face; appropriate expression; restricted and depressed affect but no agitation, anxiety, flatness, or lability; good motivation; full orientation; adequate fund of knowledge; intact judgment and insight; normal speech; no racing, slowed, disconnected, or disordered thoughts; no thought preservation; no deficiency or loosening of thought association; no tangentiality or circumferntiality; no delusions, hallucinations, obsessions, paranoia, preoccupation with violent thoughts, suicidal or homicidal ideation, suicidal or homicidal intent, or suicidal or homicidal

---

[12]The November 2014 treatment note appears in the same format as those by Dr. Ritter but does not identify who provided the treatment. *See* Tr. 628–31. Part of the note appears missing. *See* Tr. 628–31. A letter attached to the note identifies it as a medical record from Dr. Ritter. *See* Tr. 622.

plans; good eye contact; appropriate cooperation; and normal motor activity and gait. Tr. 630.

Dr. Ritter provided therapy again in December 2014. Tr. 624–27. Under "Review of Symptoms," Dr. Ritter documented generalized pain; feeling overweight; no night sweats, lethargy, or sudden exhaustion; sleep continuity disturbance but no difficulty falling asleep, early morning awakening, or excessive sleepiness; no problems with appetite; decreased concentration, energy level, interest, and libido; guilt or hopelessness; anxiety; no impairment to recent or remote memory; and no mania, panic attacks, phobias, psychotic symptoms, eating disorders, obsessions, compulsions, dissociations, or flashbacks. Tr. 624. A mental status examination showed improved grooming; hair trimmed but not combed; obesity; no acute or chronic illness; no discomfort; warm and dry skin with no noticeable scars or marks; no abnormalities of head and face; appropriate expression; restricted and anxious affect but no agitation, depression, flatness, or lability; good motivation; full orientation; adequate fund of knowledge; intact judgment and insight; normal speech, no racing, slowed, disconnected, or disordered thoughts; no thought preservation; no deficiency or loosening of thought association; no tangentiality or circumferentiality; no delusions, hallucinations, obsessions, paranoia, preoccupation with violent thoughts, suicidal or homicidal ideation, suicidal or homicidal intent, or suicidal or homicidal plans; good eye contact; appropriate cooperation; and normal motor activity and gait. Tr. 626. Under "Assessment," Dr. Ritter opined he had unstable but improved bipolar I disorder, unstable but improved anxiety, and polypharmacy, and observed he had legal problems and was unemployed, not looking for work, and applying for disability. Tr. 626–27.

In January 2015, Dr. Ritter completed a mental RFC assessment relating to the period between August 27, 2014, and December 17, 2014. Tr. 694–97. He opined Harbin has a moderately limited ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration

for extended periods, sustain an ordinary routine without special supervision, work with or in proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Tr. 694–95. He opined Harbin has a markedly limited ability to set realistic goals or make plans independently of others. Tr. 695. He checked a box indicating that, given the available evidence, he could not rate Harbin's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Tr. 695. He opined Harbin was not significantly limited in other areas. Tr. 694–95.

Regarding the inability to rate Harbin's ability to complete a normal workday, Dr. Ritter explained,

> This patient was treated by myself as his primary psychiatrist from 8/27/14 until his last visit with me on 12/17/14. During that time, he was not employed or seeking employment; therefore, I could not accurately evaluate this item. I am not aware of this patient attempting to work in an accommodating work environment. He should be offered vocational rehabilitation and with accommodations be allowed to resume work.

Tr. 695. Under "functional capacity assessment," he wrote,

> As the patient's most recent treating psychiatrist, I diagnosed him with anxiety disorder not otherwise specified (300.00); bipolar I disorder, most recent episode depressed, severe without psychotic features, (296.53); and polypharmacy, (V58.69). He previously worked as a respiratory therapist; however, with the information I have reviewed thus far it is not clear if he stopped working primarily or solely because of his mental health condition(s) or due to another general medical condition.
>
> I would recommend an independent psychiatric evaluation by a non-treating provider to obtain an appropriate functional capacity assessment for the purposes of disability assessment and determination.

Tr. 696.

The ALJ gave "limited weight" to Dr. Ritter's opinions because he had "admitted that he has little knowledge of how the claimant's mental health symptoms would affect his ability to work and he does not know why the claimant left his last job." Tr. 27. The ALJ added, "[R]ecords from Dr. Ritter show continued treatment, but most aspects of the mental status findings are normal. … Dr. Ritter appears to be confused as to why the claimant originally stopped working, which calls into question how well he understood the claimant's overall medical history." Tr. 25. He gave Dr. Ritter's opinions "some weight" to the extent they are consistent with the RFC findings. Tr. 27.

The ALJ found Harbin's medically determinable impairments could reasonably be expected to cause some of his symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms "are not entirely credible for the reasons explained." Tr. 25. He explained,

> The claimant testified that he is able to sweep, wash dishes, prepare meals[,] and shop for groceries. He testified that he has custody of his minor children and gets them ready for school each day. He testified that he has a driver's license and drives occasionally. The claimant testified that he spends time during the day reading the paper and watching television. The claimant reported that he spent time reading, watching business news and sports shows, caring for his children[,] and fishing with them. These activities suggest a level of concentration and ability that is inconsistent with a disabling level of pain. The severity of the symptoms and the alleged effect on function is not entirely consistent with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living[,] and alternations of usual behavior or habits. Such a description of the claimant's daily activities and capacity for social functioning suggest a greater capacity than that alleged by the claimant during the hearing testimony and that would preclude all sustained work activity.

Tr. 25 (internal citation omitted).

The ALJ gave other reasons for discrediting Harbin's allegations of symptoms and limitations, including that he had provided inconsistent statements about his mental health history, has had primarily "unremarkable" mental status examination

results, and treatment notes do not support the alleged severity of his musculoskeletal problems. Tr. 25–26. The ALJ summarized his findings:

> When the record is considered in its entirety, though the claimant may have some discomfort, he does not have the type of pain that would preclude him from performing work as accommodated for in the claimant's [RFC] as established above. He is only mildly limited by his mental impairment. The claimant has not provided convincing details regarding factors that precipitate the allegedly disabling symptoms. The claimant's activities of daily living and the medical evidence of record suggest that the claimant can sustain a greater capacity than he described at the hearing or in some of his reports to the state agency. Given this evidence, the undersigned concludes the claimant has not satisfied his burden to show he cannot work. The undersigned finds that neither the severity of his impairments nor the extent of his limitations are supported by the objective medical evidence of record. Furthermore, the limitations that do exist are adequately accommodated for in the claimant's [RFC]."

Tr. 27.

At step four, based on the VE's testimony, the ALJ found Harbin can perform his past relevant work as a stockbroker and a customer-service representative. Tr. 28. He therefore found no disability.[13] Tr. 28.

## V.    Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court may not

---

[13]"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A social-security claimant must prove he is disabled. 20 C.F.R. § 404.1512.

decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* The court must affirm the Commissioner's factual determinations if substantial evidence supports them, but "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standard to be applied in reviewing claims." *Brown v. Sullivan*, 921 F.2d 1233, 1235–36 (11th Cir. 1991).

## VI.   Law & Analysis

### A.   *Issue one: whether the ALJ provided good cause to discredit Dr. Ritter's opinions*

Harbin argues the ALJ mischaracterized Dr. Ritter's opinions and did not provide good cause to discredit them. Doc. 16 at 9–12. The Commissioner responds the ALJ accurately characterized Dr. Ritter's opinions and substantial evidence supports his decision to give the opinions limited weight. Doc. 17 at 4–7.

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c).

The SSA generally will give more weight to the medical opinions of treating sources[14] because they "are likely to be the medical professionals most able to provide

---

[14]A treating source is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. § 404.1502. An ALJ "may consider an

a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). But an ALJ does not have to give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence did not bolster the opinion, the evidence supported a contrary finding, or the opinion was conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41. Failure to articulate good cause to give a treating physician's opinion less weight is reversible error. *Pritchett v. Comm'r Soc. Sec.*, 315 F. App'x 806, 810 (11th Cir. 2009).

Unless the SSA gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. § 404.1527(c). If an ALJ does not clearly explain his decision, a court will not affirm simply because some rationale might have supported it. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

Here, the Commissioner does not dispute that Dr. Ritter is a treating source. *See generally* Doc. 17. The ALJ articulated three reasons to give Dr. Ritter's opinions limited weight: mental status examinations were largely normal, Dr. Ritter did not know why Harbin had stopped working, and Dr. Ritter did not know how Harbin's mental symptoms would affect Harbin's ability to work. *See* Tr. 25, 27.

Those reasons do not constitute good cause to give less weight to all of Dr. Ritter's opinions. Dr. Ritter's remark that he could not accurately evaluate an item on the mental RFC assessment related only to Harbin's ability to complete a normal

---

acceptable medical source who has treated or evaluated [a claimant] only a few times" a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." *Id.*

workday and workweek without interruptions and perform at a consistent pace without unreasonable rest periods, not any other opinion. *See* Tr. 695. Dr. Ritter's remark that he is unsure if Harbin stopped working for mental or other reasons in 2011 does not undermine his opinions on Harbin's mental limitations in 2014. *See* Tr. 696. That many mental status examination results were normal does not undermine all of his opinions because the mental status examinations did not evaluate all areas in which he opined Harbin had limitations, and some abnormal results relate to limitations Dr. Ritter found. The ALJ's statement that he gave Dr. Ritter's opinions "some weight to the extent they are consistent with the RFC" is unclear given that Dr. Ritter provided opinions about Harbin's mental limitations, but the ALJ imposed no mental limitation in his RFC findings. *Compare* Tr. 16 *with* Tr. 27. And the ALJ does not reconcile his statement that Harbin is "mildly limited by his mental impairment" with his inclusion of no mental limitation in the RFC findings. *Compare* Tr. 16 *with* Tr. 27.

The Commissioner points to evidence in the record supporting the ALJ's decision to give Dr. Ritter's opinions limited weight. Doc. 17 at 4–5. Though there may be good reasons to give Dr. Ritter's opinions less weight, the Court may not affirm an ALJ's decision simply because some rationale may support it. *See Winschel,* 631 F.3d at 1179.

The ALJ erred by failing to provide good cause for giving Dr. Ritter's opinions less weight. Reversal and remand are warranted to allow him to reevaluate Dr. Ritter's opinions in accordance with the regulations.[15]

---

[15]Harbin argues the ALJ's errors are not harmless because if he had incorporated Dr. Ritter's opinions into the RFC, he would be precluded from performing his past relevant work and Grid Rule 201.14 would direct a finding that he is disabled. Doc. 16 at 11–12. The Commissioner responds he has not shown Grid Rule 201.14 applies. Doc. 17 at 7.

At step five, an ALJ must use the claimant's RFC to decide whether a significant number of one or more jobs that the claimant can perform exists in the

**B.**    ***Issue two: whether substantial evidence supports the reasons the ALJ provided for discrediting Harbin's allegations of pain and physical limitations***

Harbin argues that the ALJ erred by using his daily activities to discredit his testimony on the level and limiting effects of his symptoms. Doc. 16 at 12–14. He contends that his daily activities are consistent with his testimony. Doc. 16 at 13. The Commissioner responds that the ALJ could consider daily activities in evaluating credibility and substantial evidence supports his credibility findings. Doc. 17 at 8–12. She points out that Harbin has not challenged the other bases for the ALJ's credibility findings. Doc. 17 at 12.

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine whether there is an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptom arising

---

national economy. 20 C.F.R. § 404.1566(b). An ALJ may rely on the Medical Vocational Guidelines ("the grids") or use a vocational expert's testimony for that determination. *Phillips v. Barnhart*, 357 F.3d 1232, 1239–40 (11th Cir. 2004). The grids allow an ALJ to consider factors such as the claimant's age, exertional limitations (such as limitations to light or sedentary work), ability to speak English, education, and job experience. *Id.* at 1240. Grid Rule 201.14 directs a finding of disabled for a claimant who is closely approaching advanced age, is a "high school graduate or more—does not provide for direct entry into skilled work," and has skilled or semiskilled work experience with no transferrable skills. 20 C.F.R. part 404, subpart P, app'x 2, Rule 201.14.

Harbin's argument that Dr. Ritter's opinions dictate a finding of disability under Grid Rule 201.14 fails. As the Commissioner points out, Harbin has pointed to no evidence that Dr. Ritter's opinions would render him unable to perform his past work. *See generally* Doc. 16. The ALJ included no mental limitation in his hypothetical to the VE, and the VE did not opine on whether a mental limitation would impact Harbin's ability to perform that work. *See generally* Tr. 92–93. Even if he could not, the ALJ did not proceed to step five and made no determination on whether Harbin has transferrable skills or can directly enter skilled work. *See generally* Tr. 14–28. Absent a determination on those factors, it is impossible to know if Grid Rule 201.14 applies. *See* 20 C.F.R. part 404, subpart P, app'x 2, Rule 201.14. Regardless, the ALJ's failure to articulate good cause to give Dr. Ritter's opinions less weight is sufficient to justify reversal and remand. *See Pritchett*, 315 F. App'x at 810.

from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the objective medical evidence does not confirm the alleged severity of a claimant's symptom, but an impairment can be reasonably expected to cause that alleged severity, an ALJ must evaluate the intensity and persistence of his alleged symptoms and their effect on his ability to work. 20 C.F.R. § 404.1529(c)(1). In doing so, an ALJ must consider all available evidence, including objective medical evidence and statements from the claimant and others. 20 C.F.R. § 404.1529(c)(2)–(3). An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). To evaluate the severity of symptoms such as pain, an ALJ may consider the claimant's daily activities; the location, duration, frequency, and intensity of the symptom; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication; measures used to relieve the symptom; and any other factor concerning functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3).

If an ALJ discredits a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, such as pain, he must provide "explicit and adequate reasons for doing so." *Holt*, 921 F.2d at 1223. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). A reviewing court should ask not whether the ALJ could have reasonably credited a claimant's testimony, but whether the ALJ had been clearly wrong in discrediting it. *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Here, under the regulations, the ALJ could consider Harbin's daily activities in evaluating his credibility.[16] *See* 20 C.F.R. § 404.1529(c)(3). Those activities do not

_____

[16]Harbin cites *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997), for the proposition that "participation in everyday activities of short duration, such as

conflict with his alleged limitations. Sweeping the floor and doing dishes is consistent with his testimony he can sit or stand for 30 minutes before he needs to lie down; likewise preparing microwavable meals and driving only 20 miles. *See* Tr. 84–86. He testified he shops only once a week or every other week, Tr. 85, and clarified in a pain questionnaire that his children put items in the basket, push the cart, put the groceries in the car, bring them to the condominium, and put them away, Tr. 332. With that clarification, shopping occasionally does not contradict his testimony. He testified he "get[s] the kids off to school," and that they ride the bus, but did not elaborate further. *See* Tr. 84–85. Making sure teenagers get to school by bus does not contradict his testimony. That leaves a single report from a 2013 self-report that he fishes with his children, with no description of the exertion required to perform that activity. Tr. 689. Absent more information, that activity does not necessarily contradict Harbin's testimony on his limitations.

The Commissioner is correct that Harbin does not challenge the other reasons the ALJ gave for discrediting his testimony, and those other reasons may support the ALJ's credibility determination. *See* Doc. 17; *see generally* Doc. 16. But because reversal and remand is necessary to allow the ALJ to reevaluate Dr. Ritter's opinions, which may affect his evaluation of Harbin's credibility, it is unnecessary to determine if his consideration of Harbin's daily activities alone would warrant reversal and

---

housework or fishing, [does not disqualify] a claimant from disability." Doc. 16 at 13. The Commissioner responds reliance on *Lewis* is misplaced because the quoted portion relates to evaluating medical opinions, not credibility. Doc. 17 at 11.

Courts have distinguished *Lewis* in cases involving credibility determinations. *See Allums v. Colvin*, No. 2:12–cv–04190–JHE, 2014 WL 1664294, at *4 (N.D. Ala. Apr. 25, 2014) (unpublished); *Jones v. Astrue*, 2013 WL 360313, at *4 (N.D. Ala. Jan. 28, 2013) (unpublished). Regardless, even if participating in limited activities alone is insufficient to disqualify a claimant from disability, the regulations permit the ALJ to consider daily activities to evaluate the severity of symptoms such as pain. *See* 20 C.F.R. § 404.1529(c)(3). The ALJ's consideration of the extent to which Harbin's daily activities conflict with his alleged symptoms was not, in itself, error.

remand. On remand, the ALJ should reconsider the extent to which Harbin's daily activities contradict his testimony and how that affects his credibility as a whole.

## VII.   Recommendation[17]

I recommend that the Court:

(1)   **reverse** the Commissioner's decision under sentence four of 42 U.S.C. § 405(g);

(2)   **remand** the case to the Commissioner with directions to reconsider the weight given to Dr. Ritter's opinions, reevaluate Harbin's credibility, and take any other appropriate action; and

(3)   **direct** the clerk to enter judgment in favor of Harbin and close the file.

**Entered** in Jacksonville, Florida, on January 26, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   The Honorable John Antoon II
Counsel of Record

---

[17]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.